# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1396 | **DATE** | 2/19/2003 |
| **CASE TITLE** | Beverage Realty vs. Chatham Club, LLC. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order.  Defendant's motion for summary judgment is denied. (20-1) Beverage Realty's motion for summary judgment is granted in part and denied in part. (34-1) Chatham's motions to strike (46-1, 46-2, 47-1) are all denied as moot.  This action is set for a status hearing on March 21, 2003 at 9:00 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

SN courtroom deputy's initials

number of notices

FEB 2 1 2003 date docketed

docketing deputy initials

FEB 2 1 2003 date mailed notice

mailing deputy initials

U.S. DISTRICT COURT

Date/time received in central Clerk's Office

Document Number

54

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BEVERAGE REALTY, INC.,          )
                                )
                 Plaintiff,     )
                                )
        v.                      )      No.   01 C 1396
                                )
CHATHAM CLUB, LLC,              )
                                )
                 Defendant.     )

**DOCKETED**

**FEB 2 1 2003**

## MEMORANDUM OPINION AND ORDER

Beverage Realty, Inc. ("Beverage") has filed a breach of

contract action against Chatham Club, L.L.C. ("Chatham"),

claiming that Chatham failed to reimburse Beverage for the cost

of remediating the environmental problems that had affected 17.64

acres of land at the southwest corner of 89th Street and Indiana

Avenue in Chicago, Illinois (the "Property"). In addition to

denying any breach on its part, Chatham filed a Counterclaim that

asserted Beverage was itself guilty of breaches that had damaged

Chatham.

After the parties had engaged in discovery Chatham moved for

summary judgment as to liability under Fed. R. Civ. P. ("Rule")

56 on the ground that Beverage's assertedly material breaches had

excused Chatham's reimbursement obligation. In turn Beverage

filed a cross-motion for summary judgment on its own claim and

also moved for summary judgment on Chatham's Counterclaim.[1] For

---

[1] Each side has complied with this District Court's LR
56.1, designed to facilitate the resolution of Rule 56 motions by
highlighting the existence or nonexistence of factual disputes.

the reasons set forth in this opinion, Chatham's motion is denied, while Beverage's cross-motion on its own claim is granted and its motion as to Chatham's Counterclaim is granted in part and denied in part.

## Summary Judgment Standards

Familiar Rule 56 principles impose on parties moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "consider the evidentiary record in the light most favorable to the non-moving party...and draw all reasonable inferences in his favor" (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)). And <u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001) has echoed the teaching of <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 248 (1986):

> A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

By definition, then, cross-motions for summary judgment

---

All the parties' filings will be identified here by "C." for Chatham and "B." for Beverage. As for the respective documents, this opinion cites to the two LR 56.1(a)(3) statements as "St. ¶--," to the responses to those statements as "Resp. ¶--," to an LR 56.1(b)(3)(B) statement of additional facts as "Add. St. ¶--," and to a corresponding response as "Resp. St. ¶--." Other abbreviations refer to the parties' exhibits ("Ex."), memoranda ("Mem."), answering memoranda ("Ans. Mem."), reply memoranda ("R. Mem."), appendices ("App.") and supplemental appendix ("Supp. App.").

require a Janus-like approach in which each nonmovant's version of any disputed facts is credited so long as it is supported by record evidence. What follows in the <u>Background</u> section and thereafter is culled from the parties' submissions and identifies any places where such a dual perspective is required.[2]

<u>Background</u>

Chatham acquired the Property from Beverage for the purpose of subdividing the land and developing a residential community (C. St. ¶6, B. St. ¶9). Beverage and Chatham executed a Remediation and Indemnity Agreement ("Remediation Agreement")[3] on June 10, 1998 (B. St. ¶10). In addition to the Remediation Agreement, the Environmental Services Agreement ("Environmental

---

[2] After Beverage had submitted its papers in response to Chatham's motion and advancing its own cross-motion, Chatham also filed motions to strike portions of an affidavit tendered by Beverage (Dkt. 47) and to strike or disregard portions of the B. Resp. (Dkt. 46). To some extent the complained-of matters are immaterial nits, and to some extent they are substantively immaterial (though technically correct) objections. But in any event it does not matter, for the results announced here do not rely at all on any legitimately challenged matters. Both those motions are therefore moot, with no detailed exegesis needed.

[3] Beverage has reproduced the Remediation Agreement as Ex. 1 of the documentary Appendix included in its LR 56.1 papers. Further references to that document will identify its provisions by "¶ --" (though the litigants have referred to "sections," the document's Paragraph 19 confirms the usage employed here)--and because the remediation provision (¶3) occupies several pages, its page references will also be included. Because the Beverage Appendix pages are numbered consecutively from Ex. 1 through Ex. 38, other references to the Appendix in this opinion will take the form "B. App. --," listing the page number rather than the particular Exhibit number.

Agreement") detailed the contract between Beverage and its remediation contractors who were to perform the remediation work (C. St. ¶11). Jamrok Environmental, Inc. ("Jamrok") was Beverage's initial remediation contractor, but it was replaced by Rizzo Associates, Inc. ("Rizzo") in February or March 1999 (C. St. ¶¶10, 14). Chatham was an express third-party beneficiary under the Environmental Agreement (C. St. ¶12).

Under the two agreements Beverage was obligated to complete numerous tasks, while Chatham was required to pay Beverage $800,000 upon completion of those tasks, offset by whatever Chatham had itself spent on remediation (C. St. ¶16). One of Beverage's tasks (which it has done, C. Resp. St. ¶36) included removing and eliminating hazardous materials at the Property (Remediation Agreement Recital 5). It says it has spent over $2.4 million to do so (B. St. ¶44),[4] and Chatham acknowledges that the hazardous materials were 500 to 600% more than contractor Jamrok had anticipated (C. Resp. St. ¶35). Another of Beverage's obligations was to obtain a "no further remediation" or closure letter ("Closure Letter") from the Illinois Environmental Protection Agency ("IEPA")(C. St. ¶¶9, 21, 28).

According to Remediation Agreement ¶3 at 6-7, "Beverage

---

[4] Although Chatham cavils on hearsay grounds at its own representative's confirmation that Beverage's documentary exhibits reflect that figure (C. Resp. St. ¶44), there appears to be no real question as to its accuracy.

4

shall use its best efforts to obtain the Closure Letter from the appropriate Environmental Agency on or before one (1) year from the closing [June 10, 1998]." Remediation Agreement ¶13 says "Time is of the essence of this Agreement and of each and every provision hereof." Any time provisions in the Remediation Agreement were based on estimates prepared by Jamrok as to how long it would take to remove the contaminated soil (B. St. ¶18; C. St. ¶37). Jamrok greatly underestimated the extent of the contamination, the amount of which was (as stated earlier) 500 to 600% of what was originally expected (C. St. ¶¶34, 46). Beverage also had to submit timely reports to IEPA (Remediation Agreement ¶3 at 6-7) and to allow Chatham to approve all correspondence (id. at 8).

In an effort to acquire the final Closure Letter, Beverage submitted materials to the IEPA on March 19, 1999 (B. St. ¶47, C. St. ¶49). On May 21 and July 27, 1999 IEPA requested further information (B. App. 256-57, 261-62), and Beverage or its contractor responded with letters on June 16 and September 24, 1999 (B. App. 258-60, 263-65). IEPA sent out an initial draft Closure Letter on November 12, 1999 (C. St. ¶40), then on March 10, 2000 it sent out another draft (id. ¶41), this time stating that all the cleanup had been completed, but it requested signatures of the lot owners for property owner certification forms ("Forms") before issuing the final Closure Letter (B. App.

271-72). During the next several months Chatham acquired many of the signatures necessary for the Forms, but it failed to acquire signatures from 36 (about a quarter) of the lot owners (B. St. ¶63). On January 19, 2001 IEPA issued its final Closure Letter, which was recorded on February 21, 2001 (B. St. ¶71; C. St. ¶31). Although Beverage was supposed to acquire a Closure Letter that covered the "entire Property" (Remediation Agreement ¶3 at 6), the final Closure Letter excluded the 36 lots ("Excluded Lots") for which no Forms signatures had been acquired (C. Resp. St. ¶72).

### Cross-motions as to Beverage's Claim

Although failure to perform its contractual duties will subject a party to liability for breach of contract, only its material breach of the contract's terms will also serve to excuse the other party from its own duty of counterperformance (Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp., 284 F.3d 693, 700 (7th Cir. 2002)).[5] If however the breach is minor, it is compensable only in damages and does not excuse the other contracting party's duty of performance (Finch v. Ill. Cmty. Coll. Bd., 315 Ill. App. 3d 831, 836, 734 N.E.2d 106, 110 (5th Dist. 2000)). And relatedly Arrow Master, Inc. v. Unique Forming

---

[5] Because Illinois law provides the substantive rules of decision in this diversity action, this opinion looks to Illinois state court cases and to our Court of Appeals' decisions construing and applying Illinois law.

<u>Ltd.</u>, 12 F.3d 709, 713 (7th Cir. 1993) reiterates that under Illinois law "[t]he primary object in construing a contract is to give effect to the intention of the parties."

Chatham claims that Beverage committed material breaches of the Remediation Agreement or the Environmental Agreement in seven different ways. Those breaches, Chatham argues, would discharge Chatham's obligation to pay Beverage $800,000. In the context of the current cross-motions, that calls for an initial analysis of whether Beverage's conduct constituted a breach of contract, and then--if the answer is "yes"--whether that breach was material.[6]

But before this Court launches into that inquiry, something must first be said about the concept of "materiality" in the context now at issue. On that score the litigants first cross swords on an issue that they approach as though the question were one of absolutes, rather than relative in nature--a dispute over whether the items about which Chatham complains are Beverage's contractual covenants as B. Mem. 5-7 would have it (in which event they would essentially be independent of Chatham's covenant to provide the $800,000 reimbursement) or conditions precedent as

---

[6]    In certain contexts Beverage also asserts that Chatham waived any breaches or prevented Beverage from fulfilling its obligations under the Remediation Agreement. As the ensuing text discussion reflects, Chatham's motion can be dispatched and Beverage's cross-motion can be granted without addressing that issue now. Instead both the waiver and prevention doctrines will be performed while looked at in conjunction with Beverage's motion for summary judgment on Chatham's counterclaim.

C.R. Mem. 2-6 contends (in which event Chatham gets to keep the
$800,000 in its pocket forever, for those conditions can never be
satisfied because Chatham's view of the time-of-the-essence
concept has rendered them impossible, inasmuch as some specified
times of performance have come and gone).

It is true that certain language in the documents reads as
though at least some of the promises with which Beverage has not
complied strictly are framed as conditions.  But in urging that
factor as allowing Chatham to escape its own promise, its counsel
have chosen to forget--or if not, have preferred to ignore
entirely--that Illinois courts address the subject of excused
counterperformance from the standpoint of equity.  Kel-Keef
Enters., Inc. v. Quality Components Corp., 316 Ill.App.3d 998,
1016, 738 N.E.2d 524, 537 (1st Dist. 2000)(citations and internal
quotation marks omitted) is exemplary of the cases announcing
that principle:

> A material breach by one party to a contract discharges
> the other party from performing its obligations.  The
> issue of whether or not a breach of contract is
> material, thereby discharging the other's duty to
> perform, is a question to be decided on the inherent
> justice of the matter.  The determination of
> materiality is a complicated question of fact,
> involving an inquiry into such matters as whether the
> breach worked to defeat the bargained-for objective of
> the parties or caused disproportionate prejudice to the
> non-breaching party, whether custom and usage considers
> such a breach to be material, and whether the allowance
> of reciprocal non-performance by the non-breaching
> party will result in his accrual of an unreasonable or
> unfair advantage.

But in this instance, as the ensuing discussion confirms, any potential for having to resolve "a complicated question of fact" dissolves in the face of the overwhelming truth that the Chatham challenges, singly or in combination, are not material in relation to its having succeeded in accomplishing its overriding purpose for entering into the transaction in the first place.

That conclusion flows inevitably from the emphasis on "the inherent justice of the matter" mandated in the controlling Illinois cases exemplified in <u>Kel-Keef</u>--a crystal clear invocation of the principles of equity jurisprudence. Illinois law has chosen to preserve the historic distinction between law and equity--it is no accident that the Circuit Court of Cook County maintains separate Law and Chancery Divisions, and the state's appellate tribunals administer justice from the same perspective. In that regard Chatham's greedy insistence on a total forgiveness of its $800,000 commitment (which, it will be remembered, almost surely covers only a third of Beverage's expenditures on remediation[7]) flouts one of the classic equitable maxims: Equity abhors a forfeiture.

Lest there be any doubt as to that characterization of a "classic equitable maxim," here is what no less an authority than

---

[7]    Even on Chatham's challenge on hearsay grounds to the evidence establishing that amount, its own lesser contention would still admit to the $800,000 representing less than half of Beverage's total outlays.

the United States Supreme Court said almost a century and a quarter ago in Jones v. Guar. & Indem. Co., 101 U.S. 622, 628 (1879), citing as authority an 1851 Illinois Supreme Court decision:

> A court of equity abhors forfeitures, and will not lend its aid to enforce them. Marshall v. Vicksburg, 15 Wall. 146. Nor will it give its aid in the assertion of a mere legal right contrary to the clear equity and justice of the case. Lewis v. Lyons, 13 Ill. 117.

And the Illinois doctrine cited there remains alive and well today, as evidenced not only by such cases as Kel-Keef but also, e.g., Scholwin v. Johnson, 147 Ill.App.3d 598, 605, 498 N.E.2d 249, 254 (2d Dist. 1986):

> In Aden [v. Alwardt, 76 Ill.App.3d 54, 59, 394 N.E.2d 716, 719 (3d Dist. 1979)] this court noted that courts of equity abhor forfeitures and will enforce them only where the right to forfeiture is clearly and unequivocally shown and injustice will not result. We stated that the decision on whether to grant relief requires a balancing of the equities in the case.

First Chatham urges that Beverage's failure to acquire a Closure Letter covering the entire Property was a material breach of contract. Where as here no ambiguity exists, contract construction is a matter of law, and the plain and unambiguous words are applied as written (Amalgamated Bank of Chi. v. Kalmus & Assocs., Inc., 318 Ill. App. 3d 648, 656, 741 N.E.2d 1078, 1084 (1st Dist. 2000)). In this instance Remediation Agreement ¶3 at 6 confirms the importance of the Closure Letter:

> The Remediation obligations of Beverage shall not be fully satisfied until the appropriate Environmental

10

Agency issues a Closure Letter which for the purpose of this Agreement is defined as a comprehensive no further action letter for the entire Property indicating that the entire Property meets the Tier 1 clean up obligations for residential use pursuant to 35 IL Admin. Code Part 742.

And to like effect Remediation Agreement ¶3 at 7-8 provides:

The Remediation work to be performed pursuant to the Remediation Contract shall be deemed provisionally completed (but the Remediation obligations of Beverage shall continue until the issuance of the Closure Letter) when [numerous qualifications are completed].

So the acquisition of a Closure Letter covering the entire Property was stated to be a condition of Beverage's completion of its Remediation Agreement obligation. And it will be recalled that even though all remediation work had already been completed, IEPA sent a Closure Letter that did not cover all of the Property--the Excluded Lots were omitted because no signatures had been obtained for those Forms (B. Resp. St. ¶25).

From the Remediation Agreement it is clear that a need to acquire Forms signatures was not anticipated by either party (B. Resp. St. ¶62): Nowhere does the Remediation Agreement refer to such Forms, let alone place the responsibility of acquiring them on either Chatham or Beverage.[8] It was not until it received the

_____

[8] B. Mem. 12 claims that Chatham assumed the responsibility of acquiring the signed Forms, so that it is precluded from claiming a breach because of the doctrine of prevention. If Chatham were indeed responsible for acquiring the signed Forms, Beverage would not have breached its Remediation Agreement obligations. Because this aspect of the claim can be (and is) resolved on other grounds, consideration of this contention is deferred until the section of this opinion that analyzes

March 10, 2000 draft Closure Letter that Beverage first learned that each owner of a lot or other portion of the Property had to sign a "Property Owner Certification of Closure Letter Under the Site Remediation Program" form that would be recorded with the final Closure Letter (B. App. 271-72). According to the draft Closure Letter, Beverage as the Remediation Applicant was required to obtain and provide to the IEPA any additional material, including the signed Forms (B. App. 275).

Beverage acknowledges that IEPA never imposed the responsibility to get the signed Forms on Chatham (B. Resp. St. ¶59), and it admits that IEPA never told Beverage that it was absolved of the responsibility to get the Forms (B. Resp. St. ¶67). Moreover, the June 10, 1998 Fourth Amendment to the Purchase and Sale Agreement between the litigants had given Beverage "sole and exclusive control over the means and the methods by which Beverage fulfills its obligations to provide the Closure Letter, as such term is defined in the Remediation Agreement" (B. App. 360). Beverage is also made financially responsible for any delays caused by additional submissions to IEPA (Remediation Agreement ¶3 at 8). In sum, on the premise--assumed for this purpose--that it was Beverage that failed to acquire all of the signed Forms and thereby failed to ensure that the Closure Letter covered the entire Property,

Beverage's motion for summary judgment on Chatham's Counterclaim.

Beverage breached its contractual undertaking.

But then the question becomes whether such an assumed breach was so material as to excuse Chatham's payment. As <u>Elda Arnhold & Byzantio</u>, 284 F.3d at 700 (citations and internal quotation marks omitted) has read Illinois law, in language that substantially echoes the earlier quotation from <u>Kel-Keef Enters.</u>:

> In determining whether a breach is material, some Illinois courts have stated that the question is whether performance of the disputed provision was the <u>sine qua non</u> of the agreement, <u>i.e.</u>, of such a nature and such importance that the contract would not have been made without it. Other courts have stated that the question of whether a breach is material, thereby discharging the other party's duty to perform, is based on the inherent justice of the matter.

> We are convinced that these cases demonstrate that, under Illinois law, the materiality inquiry focuses on two interrelated issues: (1) the intent of the parties with respect to the disputed provision; and (2) the equitable factors and circumstances surrounding the breach of the provision.

C. R. Mem. 6 argues that Beverage is implying that the only intent of the parties in the Remediation Agreement was to remove the contaminated soils. Any such reading of sole intent would be unpersuasive, because even though the entire Property was remediated to IEPA's standards for residential use (C. Resp. St. 36) Remediation Agreement ¶3 at 6 also specifically called for the acquisition of the Closure Letter for the entire Property. Because a Closure Letter serves as prima facie evidence that a property "does not constitute a threat to human health and the environment and does not require further remediation" (B. App.

286), the marketability of any lot without a Closure Letter is decreased (NRC Corp. v. Amoco Oil Co., 205 F.3d 1007, 1013 (7th Cir. 2000)). Because the Closure Letter does not cover the 36 Excluded Lots, any owner of those lots cannot exhibit that document to show that the property has no troublesome environmental issues.

When viewed through the required filter on Chatham's motion that includes all reasonable inferences in favor of nonmovant Beverage, and indeed even when viewed through an unfiltered lens or a filter favoring Chatham on Beverage's cross-motion, the basic intent of the parties manifested in their contract was to clear the entire Property of sufficient pollution to enable Chatham to develop and sell the Property (Remediation Agreement Recital 4) while being protected from litigation stemming from any previous contamination (id. Recital 9). Both Remediation Agreement ¶4 and the Environmental Agreement (B. App. 66) support that reading by requiring Beverage and Jamrok to continue work on decontaminating the Property even if there were any disputes or defaults.

Here the proof of the pudding has been in the eating: Chatham has indeed successfully developed the Property and sold all the lots--the Excluded Lots too (B. St. ¶20), and the removal of contaminants has succeeded in meeting IEPA's levels for safe residential use (C. Resp. St. ¶36). In sum, the fact that the

14

Closure Letter, issued some two years ago, did not cover the entire Property must be held a nonmaterial breach of the contract in relation to the forfeiture that Chatham seeks as its pound of flesh--surely not one that, in light of "the equitable factors and circumstances surrounding the breach of the provision" (Elda Arnhold & Byzantio, 284 F.3d at 700), can operate to reward Chatham to the tune of its required $800,000 reimbursement payment. It is therefore not discharged on that basis from its Remediation Agreement duty to reimburse Beverage in that amount.

Next Chatham argues that Beverage committed a material breach by failing to obtain the Closure Letter until 19 months after it was due (C. Mem. 5). Parties to a contract may of course determine time deadlines to be material terms of the contract (In re Krueger, 192 F.3d 733, 742 (7th Cir. 1999)). And as already stated, Remediation Agreement §13 states "Time is of the essence of this Agreement and of each and every provision hereof." It will be remembered that the same document specifies that "Beverage shall use its best efforts to obtain the Closure Letter from the appropriate Environmental Agency on or before one (1) year from the Closing [June 10, 1998]" (id. §3 at 6-7), and the final Closure Letter was not issued until January 19, 2001 or recorded until February 21, 2001.

But in light of the "best efforts" language, obviously different from the establishment of a bright-line drop-dead

provision, it would seem most likely that a factual issue would control the question whether Beverage breached the "time is of the essence" provision.[9]  That inquiry would of course include the inference-drawing requirement in Beverage's favor.  But because analysis confirms that here too the materiality issue in relation to Chatham's $800,000 reimbursement obligation permits of only one answer from any perspective, the discussion here will eschew any such pro-Beverage inferences and will even extend to reasonable pro-Chatham inferences.

No court's inquiry into the issue now up for consideration can end with the mere recitation of contractual language stating that time is of the essence of the contract.  Even where the contract contains such an express clause, it is still necessary to "inquire into the situation of the parties and the underlying circumstances to determine whether a delay in performance resulted in a 'material breach'" (Anest v. Bailey, 198 Ill. App. 3d 740, 746, 556 N.E.2d 280, 283 (2$^d$ Dist. 1990) and cases cited there).  Thus, before a court acts to enforce such a provision in its strictest sense, it must make a determination of the "intent of the parties with respect to the disputed provision and the equitable factors and circumstances surrounding the breach of the

_____

[9]    Not surprisingly, Beverage advances an argument on that score on the premise that it could not control how quickly IEPA responded (B. Mem. 10).  Although that argument may perhaps be flawed in certain respects, this opinion need not resolve that issue for the reasons stated in the text.

provision," both as taught by <u>Elda Arnhold & Byzantio</u>.

From the undisputed facts before this Court it cannot reasonably be found (or even inferred) that the parties intended the "best efforts" provision to be strictly enforced in "time of the essence" terms so as to cause a forfeiture of the required $800,000 reimbursement. After all, the true essence of the Remediation Agreement contract--the parties' intent--was to clean up the Property so that it could be developed by Chatham, divided into lots and sold as residential units. To that end the obvious need for Beverage's exercise of its best efforts to obtain the Closure Letter by June 10, 1999 (again remember, not an absolute deadline) was to assist Chatham in selling the lots by assuring prospective buyers of their environmental safety.

In those terms the time-of-the-essence provision was not a stand-alone overriding element of the contract--instead it was intended to facilitate the truly vital contractual purpose: the ultimately successful development of the Property. In that light the delayed issuance of the Closure Letter was not at all a material breach of the Remediation Agreement under the circumstances that eventuated (circumstances detailed in the earlier discussion), but rather a minor breach in the context now at issue. Hence Chatham may sue for damages that it may have sustained from delayed sales of lots on the Property or from other reasonable costs of reassuring buyers, but it is <u>not</u>

excused from its own required performance: the payment of $800,000 under the Remediation Agreement.

As its next attempt to place an arrow in its quiver (the first two having been broken), Chatham contends that Beverage's failure to submit materials (i.e., technical information and reports) to IEPA in a timely fashion was a material breach sufficient to discharge its duty of counterperformance. According to Remediation Agreement ¶3 at 6-7:

Beverage shall use its best efforts to cause the Submittals to be delivered to the appropriate Environmental Agency within thirty (30) days after its provisional completion of the Remediation, but in no event later than January 10, 1999 if no extension is granted and March 10, 1999 if an extension is granted.

As before, such on-time submission of materials to the IEPA cannot be converted into a sine qua non of the parties' agreement either under the separate "time of the essence" provision or otherwise, in view of all the circumstances. With Chatham having sold all the lots on the Property, the long-past event of a late submission to IEPA is a patently minor breach, not a breach sufficiently material to discharge Chatham's $800,000 obligation.

Nothing daunted, Chatham next urges that Beverage's failure to submit additional materials (i.e., the necessary signatures for the Forms) was a material breach. C. Mem. 11 insists that Beverage's failure to make those submissions led not only to an incomplete Closure Letter covering only 75% of the Property, but that the failure to make submissions "added another 6-8 months of

18

delay to the ultimate 19-month delay in the issuance of the NFR
Letter." But that position, when sought to be used to excuse
Chatham's performance in its entirety, is torpedoed by this
opinion's earlier rulings that neither the incomplete Closure
Letter nor any delay in the issuance of that Letter was a
material breach in that sense. That being so, Beverage's failure
to submit additional materials to IEPA also could not meet the
material breach standard in terms of the already-identified
contractual purpose.

Next Chatham recasts some of its claims to contend that
Beverage breached the Remediation and Environmental Agreements
because it did not complete--or at least did not timely
complete--the remediation work. According to C. Mem. 14 the
remediation work includes (1) the actual soil excavation and
removal work, (2) the submittal requirements to IEPA, (3) the
additional submittals of signed Forms to IEPA and (4) additional
obligations of Beverage's remediation contractors. Both
Chatham's global argument of noncompletion and its lesser
contention of untimely completion fail to support the forfeiture
remedy that it seeks.

Because Beverage has removed from the Property all hazardous
materials as required by both the Remediation Agreement and IEPA
(C. Resp. St. ¶36), Chatham's first contention of overall
noncompletion is obviously meritless. As for the timeliness

issue, it has already been held that any breaches related to delayed submittals or to untimely completion of the remediation work are not so material as to excuse Chatham's performance, even though it may sue for damages. Finally, as to the fourth remediation component identified by Chatham, it refers to Beverage's commitments (1) to get Chatham's expression of satisfaction on all remediation work and (2) to certify to Chatham that all required submittals were made to IEPA. Even though Beverage did not do either of those things, any notion that they reach the level of materiality in the present context is frankly frivolous--the argument flunks the proverbial straight-face test.

Chatham next invokes its position as a third party beneficiary under the Environmental Agreement to assert that Beverage materially breached the Remediation and Environmental Agreements by not paying remediation contractor Jamrok (C. Mem. 18). According to the Environmental Agreement, Beverage was to pay Jamrok for work within 30 days of its invoice date (B. App. 22). In that respect C. Mem. 18 claims that failures to pay Jamrok led to problems with the remediation and submittal process to IEPA. Not only does any asserted failure to pay Jamrok fail to qualify in its own right as a material breach of the Remediation Agreement, however, but any arguable delay in submissions ascribable to any such failure would be defeated for

the same reasons already discussed at length.

Chatham's last gasp effort to claim a material breach points to Jamrok's not having given Chatham information about the remediation work before submitting it to IEPA (C. Mem. 19). That is wholly unpersuasive, for Beverage's only obligation under Remediation Agreement ¶4 was to include a provision in its remediation contract confirming Chatham's right to receive such information, and Beverage did just that in the Environmental Agreement (B. App. 33). Nothing in the documentation made Beverage an insurer of Jamrok's performance in that respect, even apart from the pettiness of that item in materiality (or more accurately nonmateriality) terms. Sometimes counsel lose sight of how the advancement of obviously baseless arguments can taint otherwise respectable ones--but as the extended earlier analysis reflects, all of Chatham's other arguments have failed on their own without reference to its lawyers' poor judgment in presenting this one.

No matter how many zeros are added together, their sum is the same. As to the purported materiality of Beverage's breaches in the context of what is at issue on the present cross-motions, Chatham has succeeded not only in losing its own motion (which is of course denied) but also in confirming Beverage's entitlement to a summary judgment that confirms Chatham's $800,000 reimbursement obligation, subject to diminution only by any

possible recovery on its Counterclaim.  This opinion turns to that subject.

## Beverage's Motion as to Chatham's Counterclaim

Here is how Chatham's Counterclaim ¶9 lists its asserted damages from Beverage's alleged contractual breaches discussed in the first substantive section of this opinion:

> lost sales or refunded escrow deposits arising from rescinded sales or lost potential purchasers; delayed sales and closings, resulting in increased costs for carrying and financing the construction loan; costs incurred to cure Beverage's defaults and performance failures; costs of excavation; payments to Jamrok in order to effect sales; payments to potential and actual home purchasers to settle their claims and litigation; lost or delayed tax increment financing; attorney's fees; and lost reputation of Defendant and its principals.

Beverage's Rule 56 motion counters at B. Mem. 15 (1) either that it has not breached the Remediation Agreement or, if it has, that any breach has been excused pursuant to the doctrines of waiver or prevention and (2) that in any event "Chatham can adduce no evidence showing that any alleged breach proximately caused the injury alleged."

Even apart from any need for inference-drawing in Chatham's favor as the nonmovant at this point, it cannot be gainsaid in light of the early discussion that Beverage did breach the Remediation Agreement and Environmental Agreement, albeit not in the material sense that lets Chatham off the hook for $800,000. And Beverage's waiver argument also fails, for even its own

Mem. 11 cites the statement in <u>Williston on Contracts</u> that if no material breach occurred, the nonbreaching party could nevertheless "recover those damages caused by [a] partial breach."

As an alternative string to its bow, Beverage invokes the doctrine of prevention to bar Chatham's counterclaim on the premise that Beverage became relieved of its responsibility when Chatham "prevented" Beverage from completing some tasks (see, e.g., <u>Wasserman v. Autohaus on Edens, Inc.</u>, 202 Ill. App. 3d 229, 239, 559 N.E.2d 911, 918 (1st Dist. 1990)). Chatham's conduct prevented Beverage, it says, from (1) acquiring a Closure Letter covering the entire Property, (2) timely acquiring the Closure Letter on a timely basis, (3) submitting all the signed Forms to IEPA, (4) submitting reports to IEPA on a timely basis and (5) remediating the Property on the contractually specified timetable.[10]

All of the first three factors are linked to the question of who had the responsibility for acquiring the signatures for the Forms. It has already been pointed out that Beverage as the Remediation Applicant was legally and financially obligated to

---

[10] Beverage has not claimed that the doctrine of prevention applies (1) to its failure to pay Jamrok or (2) to Jamrok's failure to provide Chatham with correspondence to IEPA. For the reason stated in the preceding section, it is difficult to see how that second matter can be laid on Beverage's doorstep in terms of liability (and hence of damages).

obtain and provide to the IEPA any additional materials (B. App. 272, 275), a category that would include the signed Forms. Although Beverage claims that Chatham's acquisition of the signed Forms translates into a complete assumption of that obligation such as to discharge Beverage from responsibility, IEPA never expressly placed responsibility on Chatham to acquire the signed Forms, nor did it expressly discharge Beverage from its responsibility to acquire them (B. Resp. St. ¶¶59, 67). Nor did the Remediation Agreement require Chatham to acquire the signed Forms (B. Resp. St. ¶65). Moreover, Chatham's representative Billie Jo Spathies ("Spathies") testified that Chatham helped Beverage "as an accommodation...in the spirit of cooperation" in the course of conducting closings, but that Chatham believed it had no obligation to acquire the signed Forms (Spathies Dep. 79-80)--testimony that must be credited for Rule 56 purposes at this point.

At this stage it is necessary to hold only that a reasonable jury could conclude that Chatham had not assumed total responsibility to acquire the signed Forms, with at least partial responsibility remaining with Beverage. As an added fillip, there is also no evidence that Beverage tried to acquire signatures or that Chatham would have necessarily hindered it in

any such attempt.[11] Because it cannot be held as a matter of law that Chatham "prevented" Beverage from acquiring the Forms, Beverage's three prevention claims linked to that purported action fail at this threshold stage.

Beverage's other two prevention claims focus on the asserted untimeliness of its submissions of materials to IEPA and of its remediation of the Property, as to which Beverage faults Chatham's asserted failure to demolish buildings on the Property in a timely manner. In view of the conflicting times between demolition dates (C. St. and B. Resp. St. ¶¶83-86), a jury could reasonably rule against Beverage on the basis that the remediation was not promptly completed on some parcels.[12]

With Beverage thus having failed to cut Chatham off at the pass by threshold defenses, it becomes necessary to examine its substantive attack on the damages question. That calls for a look at whether Chatham has provided enough evidence to indicate the likelihood of causation between Beverage's breaches and the alleged injuries.

---

[11] Beverage's reference to Spathies' testimony that she was unsure whether Chatham would have allowed Beverage to communicate with lot owners (B. St. ¶¶64-65) is insufficient under the pro-Chatham stance required by Rule 56.

[12] B. Mem. 14 also argues that Chatham prevented Beverage from performing timely remediation because of the presence of Chatham's building contractors. But Beverage's record citation (B. App. 163) indicates that delays also could have been caused by an increase in the amount of contamination, not solely by the presence of Chatham's building contractors.

B. Mem. 16 urges that any damages stemming from assertedly delayed closings cannot be recovered by Chatham. To be sure, Chatham's representative admitted that seven purchasers communicated to Chatham a multitude of reasons for reneging on their purchase and sale agreements (B. St. ¶95). But even though all of the homes were eventually sold (B. App. 219A-219B), Richard Gdowski ("Gdowski") testified that some initial sales were lost due to the home purchasers' concerns about the remediation of their lots (Gdowski Dep. 9-14). Gdowski further testified that Chatham sustained increased carrying costs and financing charges (id. 16).[13] Through an application of the principle that the facts must now be construed in a light reasonably favorable to nonmovant Chatham, the underlying cause of the delayed closings could have been Beverage's breaches. That is enough for the claim to survive for now, though it must be said that hearsay objections might well operate to defeat this facet of Chatham's case.

---

[13] Chatham also claims as damages $95,000 in escrow deposits that were repaid to terminating purchasers. From the scant evidence in the record (Gdowski was unclear in many respects, with portions of his testimony clearly being hearsay), it cannot be determined if that figure represents (1) the total amount of lost deposits from the cancelled purchases, (2) the difference between the deposits and sale prices obtained from initial purchasers and final purchasers or (3) the lost interest that would have been earned during the time interval between the initial aborted sales and the final sales. In all events, it cannot be said at this point that Chatham's counterclaim for such claimed damages is invalid as a matter of law.

Chatham also seeks recovery for the costs incurred to remove what it labels as "unsuitable soil." Although Remediation Agreement ¶3 at 6 obligated Beverage to meet Tier 1 obligations and hence to remove any <u>contaminated</u> soil, nowhere in that document or the Environmental Agreement is Beverage obligated to remove "unsuitable soil." Gdowski himself acknowledged that the "unsuitable soil" was not environmentally contaminated (B. App. 220).

That does not necessarily defeat the claim, however, for Remediation Agreement ¶¶7 and 8 also required Beverage to offset against the $800,000 reimbursement for remediation costs any such costs that Chatham itself incurred in remediating the Property. According to Spathies the subcontractor's removal of "unsuitable soil" was actually "[m]oving piles of dirt around so that Jamrok could get in, test and remediate in various areas" (Spathies Dep. 53). It is possible, if that vague characterization (which for now gets the benefit of a strained inference in Chatham's favor) can be clarified to equate the expenses involved to remediation work that entitles Chatham to an offset of its obligation to reimburse Beverage, that a jury could so find.

To convince buyers to purchase lots on the Property, Chatham needed some indication that the lots were free from contaminants. In January 1999, because Beverage had not yet obtained the Closure Letter, Chatham began making $50 payments to Jamrok for

individual letters that would reassure prospective owners and thus assist in closings (Spathies Dep. 69-70). And because those letters could have been necessary to effectuate closings, Beverage's motion for summary judgment on that claim is also denied.

Chatham also says that it paid $7500 to settle litigation brought by the Twilley family, a portion of that sum being attributable to the Twilleys' environmental claim against Chatham. Although the principal evidence points to the failure of Chatham to provide a wheelchair-accessible house, Spathies' Dep. 59 testimony also identified remediation as one of Twilley's concerns about the house. As such, the claim for settling the Twilley litigation cannot be wholly eliminated at the summary judgment stage.

B. Mem. 17 also challenges Chatham's claim that Beverage's breaches resulted in delayed or lost tax increment financing. On that score Chatham acknowledges that before it will be paid any money by the City of Chicago, those parties must sign a redevelopment agreement--and it confirms that such an agreement has not yet been signed (B. App. 139). But that scenario poses a classic proximate cause question: Chatham need not show that Beverage's breach was the sole cause of its lost TIF money, but rather that Beverage was a contributing cause. Another piece of the puzzle would depend on whether any cause that is ascribable

to Chatham, so that it could not have obtained the redevelopment agreement anyway, broke the link that could impose liability on Beverage.

In this situation, there is a good deal that needs to be fleshed out as to whether any delays caused by Beverage's breaches in remediation and in acquiring the Closure Letters bore a proximate causal relationship to Chatham's delayed generation of real estate taxes and of any consequent TIF financing (Spathies Dep. 92-93, C. Resp. St. 94; B. App. 146). But at least at this stage it cannot be held as a matter of law that Beverage's breaches did not contribute to the delayed acquisition of TIF financing.

Next Beverage tries to eliminate Chatham's claim that it paid attorneys' fees to "address and cure remediation defaults and performance deficiencies" (B. App. 122). Spathies testified that additional legal fees were incurred "in obtaining and monitoring not only the remediation, as it wasn't getting complete [sic], but then obtaining the consents of owners to get the NFA letter" (Spathies Dep. 9). That evidence is also enough to stave off a summary judgment determination that the legal fees could not be ascribable to Beverage's breaches.

Finally Chatham claims that its reputation was damaged as a result of Beverage's alleged untimely remediation. But a party suing for breach of contract is not entitled to any damages to

its reputation caused by breach of contract (Dacor Corp. v. Sierra Precision, 753 F. Supp. 731, 733 (N.D. Ill. 1991) and cases cited there, applying Illinois law). That portion of Beverage's opposition to Chatham's damages claim is upheld.

Conclusion

Neither party has fully met its burden of establishing the lack of a genuine issue of material fact. Not only must Chatham's Rule 56 motion as to Beverage's allegedly material breaches be denied, but Chatham has succeeded in confirming its liability to Beverage for the payment of its contractual $800,000 reimbursement obligation, subject only to offset by any amounts it may ultimately establish as damages under its Counterclaim.

As for Beverage, its cross-motion for summary judgment on that $800,000 issue is granted, because there are no genuine issues of material fact to block its entitlement to a judgment as a matter of law. But on its other motion, it has in turn failed to create any genuine issue of material fact to withstand most aspects of Chatham's counterclaim as a matter of law--only Chatham's claim for damage to its business reputation succumbs in Rule 56 terms.

All of this means of course that it will take a trial to resolve in an adversarial manner the numerous issues posed by Chatham's Counterclaim. Although summary judgment motions are most frequently advanced after discovery has been completed, Rule

56 is not limited to that stage of litigation, so that a status hearing will be required to ascertain what more is needed to make the case ripe for trial and to establish a schedule to that end.

But this Court would be remiss if it did not remind the parties that the need to expend substantial further resources in that regard, coupled with the risks inherent in rolling the dice with uncertain outcomes, ought to provide sophisticated commercial opponents such as these with a powerful incentive to seek resolution of their differences short of trial. With that in mind, this Court sets the next status hearing date farther out than would otherwise be the case--to 9 a.m. March 21, 2003.

Milton I. Shadur
Senior United States District Judge

Date: February 19, 2003